UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

JEFFREY SLAUGHTERBUTLER,

                  Petitioner,

v.

CONNIE HORTON,

                  Respondent.

_____/

Case No. 2:18-cv-24

Honorable Janet T. Neff

## **OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Jeffrey Slaughterbutler is incarcerated with the Michigan Department of Corrections at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. On July 11, 2014, following a five-day jury trial in the Kent County Circuit Court, Petitioner was convicted of first-degree felony murder, in violation of Mich. Comp. Laws § 750.316; armed robbery, in violation of Mich. Comp. Laws § 750.329; three counts of assault with intent to do great bodily harm less than murder (AGBH), in violation of Mich. Comp. Laws § 750.84; and the use of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b. On August 26, 2014, the court sentenced Petitioner to concurrent prison terms of life without the possibility of parole for murder, life for armed robbery, and 6 to 10 years for each count of AGBH. Those concurrent sentences were to be served consecutively to a sentence of 2 years for felony-firearm. (J. of Sentence, ECF No. 1-1, PageID.27.)

On February 20, 2018, Petitioner filed his § 2254 petition raising nine grounds for relief, as follows:

I.     The trial court abused its discretion in admitting into evidence a "rap" video because the evidence was not relevant, was more prejudicial than probative, and violated Defendant's due process right to a fair trial.

II.    The trial court abused its discretion in denying the motion for a new trial (which contended that the trials should have been severed) when counsel for one of the co-defendants pointed his finger at Defendant Slaughter-Butler and accused him, even though no motion to sever the trials had been brought.

III.   The trial court abused its discretion when it denied a motion for a new trial without holding an evidentiary hearing when one of the principal witnesses recanted his testimony.

IV.    Trial counsel denied defendant of his constitutional right of confrontation guaranteed by the Sixth Amendment and effective assistance of counsel guaranteed by the Sixth Amendment when his lack of cross-examination prevented Defendant from placing before the jury facts from which bias, prejudice, or lack of credibility of a prosecution witness could be inferred.

V.     Trial counsel's failure to investigate evidence presented in defendant's trial prejudiced him and violated his Fourteenth Amendment right of Equal protection of the law and my Sixth Amendment right to effective assistance of counsel guaranteed by the United States Constitution.

VI.    Trial counsel's failure to request a voluntary manslaughter instruction denied Defendant his right to due process and his Sixth Amendment constitutional right to effective assistance of counsel.

VII.   Trial counsel's failure to object to prejudicial evidence as well as prosecutorial misconduct deprived defendant of a fair trial and effective assistance of counsel guaranteed by the United States Constitution.

VIII.  Trial court felony murder instruction removed the essential element of malice from the jury's consideration and deprived defendant of a fair trial and due process guaranteed by the United States Constitution.

IX.    Convictions of felony-murder and underlying felony violate Defendant's double jeopardy rights guaranteed by the United States Constitution.

(Pet., ECF No. 1, PageID.8–20.)   Respondent asserts that certain grounds are procedurally defaulted and non-cognizable, and that all of Petitioner's grounds for relief lack merit. (ECF No. 22.) For the following reasons, the Court concludes that Petitioner has failed to set forth a

2

meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

<u>**Discussion**</u>

**I.      Factual Allegations**

The Michigan Court of Appeals described the facts underlying Petitioner's prosecution as follows:

> On December 29, 2012, Kevin Harris, George Woods, and Jashawn Tatum were with Jason Cherry in the basement at 1249 Dickinson Street in Grand Rapids, Michigan, where Cherry was selling marijuana. Four men, all armed, entered the basement. Gunshots were fired, and Cherry, Harris, Woods, and Tatum were hit. Cherry died. The armed men stole marijuana and cash that had been sitting on a table in the basement. At trial, Isiah Latham and Craig Hureskin testified that Tamaine Foster had devised a plan to rob Cherry and that they, along with Overstreet and Slaughter-Butler, participated in the robbery.

(ECF No. 23-18, PageID.775–76.) Petitioner was jointly tried with co-defendant Tory Overstreet. (*Id.*, PageID.775.) The Court supplements these facts with relevant information from the trial court record below.

Rasheedah Heath testified that she was Jason Cherry's girlfriend at the time of the offense. (ECF No. 23-8, PageID.616–17.) On December 28, 2012, she and Cherry had just arrived at his house after going out to eat when they were approached by three men in the driveway. (*Id.*, PageID.617.) Heath recognized one of the individuals as Tamaine Foster. (*Id.*) The men asked if they had marijuana. (*Id.*) Cherry said yes, and Heath argued with Cherry that he should not sell to the men because he did not know them. (*Id.*)

Isiah Latham also testified at trial. (*Id.*, PageID.618.) By the time of Petitioner's trial, Latham had entered into an agreement to plead guilty to second-degree murder and armed robbery and receive a minimum sentence of 22 years' incarceration. (*Id.*) Latham testified that he had been

3

part of a rap group, Please Believe It (PBI). (*Id.*, PageID.619.) PBI consisted of about seven individuals, including Petitioner, Hureskin, Latham, and Tamaine Foster. (*Id.*) Latham testified that it was Foster's idea to rob Cherry. (*Id.*) Latham owned the AK-47 that Petitioner carried on the night of the incident. (*Id.*, PageID.620.) Foster entered the house first, followed by Tory Overstreet, then Petitioner. (*Id.*, PageID.621.) According to Latham, they all had their firearms out and stated "Don't move." (*Id.*) Someone moved, and they "just got to shootin'." (*Id.*) Latham saw Petitioner shooting during the incident. (*Id.*) Latham and Foster grabbed about a quarter pound of marijuana, and the group ran out of the house. (*Id.*) On cross-examination, Petitioner was able to have Latham admit that he had previously lied to a detective about the incident when he was first arrested. (*Id.*, PageID.625–26.)

Detective Eric Boillat testified as an expert in analyzing cell phone tower record information. (ECF No. 23-9, PageID.640–41.) He analyzed records provided for the phone number associated with Hureskin, as well as cell phone tower maps associated with Petitioner's phone. (*Id.*, PageID.643.) Detective Boillat testified that these maps indicated that Petitioner's phone hit a tower in a sector covering the Dickinson Street address. (*Id.*, PageID.644.) On cross-examination, Petitioner's counsel elicited the fact that Detective Boillat could not determine "who had the phone in their hand" from the records. (*Id.*, PageID.646.)

Detective John Purlee testified about a video called "Gettin' Doe" that was located on Foster's computer. (*Id.*, PageID.649.) The video depicted PBI—including Foster, Latham, Hureskin, and Petitioner—with their faces partially covered with bandannas and rapping about "a number of things, about girls, violence." (*Id.*) The prosecution played the video for the jury.

(*Id.*, PageID.650.) On cross-examination, Detective Purlee agreed with counsel that Petitioner was "not a real active participant" in the video and was more "in the back." (*Id.*)

Craig Hureskin also testified for the prosecution. (*Id.*) He indicated that he had pled guilty to second-degree murder in exchange for a sentence of 10–15 years' incarceration. (*Id.*, PageID.651.) Hureskin was the getaway driver on December 29, 2012. (*Id.*) Prior to the robbery, Hureskin picked up all of the involved individuals, including Petitioner. (*Id.*, PageID.652.) When they arrived at Dickinson Street, Hureskin saw Petitioner exit the car "with the rifle." (*Id.*, PageID.653.) Petitioner still had the gun in his hand when he ran back to the car after the incident. (*Id.*) On cross-examination, Petitioner's counsel was able to get Hureskin to admit that he had committed perjury at his investigative subpoena hearing, and that a perjury charge had been dismissed as part of his plea agreement. (*Id.*, PageID.655.)

Petitioner appeared for sentencing on August 26, 2014. (ECF No. 23-14.) Following sentencing, Petitioner, through counsel, filed a motion for a new trial, asserting that Isiah Latham had recanted his testimony. (ECF No. 23-18, PageID.808.) Petitioner argued that Latham "was one of only two witnesses to place [him] at the scene of the offense, and to testify that he was carrying a firearm." (*Id.*, PageID.810.) Petitioner requested an evidentiary hearing regarding Latham's recantation, as well as a new trial. (*Id.*) The trial court held a hearing regarding the motion on February 27, 2015. (ECF No. 23-15.) The court denied Petitioner's motion for a new trial, finding that the testimony that Latham "gave in open court and under oath and subject to cross-examination was far and away the more believable in every respect." (*Id.*, PageID.723.)

Petitioner subsequently appealed his convictions to the Michigan Court of Appeals. In the brief he filed with the assistance of counsel, Petitioner raised the first three issues set forth above.

(Pet'r's Appeal Br., ECF No. 1-1, PageID.46.) In a *pro per* supplemental brief, Petitioner added the other six issues set forth above. (Pet'r's Supp. Pro Per Br., ECF No. 1-1, PageID.128.) The court of appeals consolidated Petitioner's appeal with the appeal filed by co-defendant Overstreet. (ECF No. 23-18, PageID.786.) The court of appeals affirmed Petitioner's convictions and sentence on March 22, 2016. (*Id.*, PageID.775–85.) Petitioner then filed a *pro per* application for leave to appeal to the Michigan Supreme Court. By order entered December 7, 2016, the supreme court denied leave to appeal. *People v. Slaughter-Butler*, 887 N.W.2d 632 (Mich. 2016).

This § 2254 petition followed. Along with his petition, Petitioner filed a motion to stay these proceedings so that he could return to the trial court and file a motion for relief from judgment raising the following new issues:

X. Petitioner was denied his state and federal due process and equal protection rights to fair trial where trial counsel failed to challenge the veracity of the arrest warrant, Fourth and Fifth Amendment defects in the procedures and bind-over by the district and circuit court judges, where there is a structural error and defect that warrants the current judgment and sentence be vacated and remanded for an evidentiary hearing and an entrapment hearing.

XI. Petitioner was denied his state and federal due process and equal protection rights to a fair trial, where the trial court's evidentiary rulings are clearly erroneous, did not meet the standards of MRE or FRE 103, 106, 901 and video that warrants the current judgment be vacated and remanded for an evidentiary hearing.

XII. Petitioner was denied his state and federal due process right to effective assistance of counsel at trial where trial counsel prejudiced the defense by failing to file proper pretrial and post-trial adequate motions to suppress and quash, renewed motions for directed verdict, interview exculpatory witnesses and investigate a plea offer by the prosecution, that warrants a remand for an evidentiary hearing and/or a Ginther hearing.

XIII. Petitioner was denied his state and federal due process and equal protection rights to a fair trial when the trial court's comments, fact-finding, bias and piercing the veil of impartiality and had an injurious effect on the jury verdict, that is a "structural error," structural defect that warrants the current

6

judgment and sentence be vacated and remanded for an evidentiary hearing for a new trial and a "judicial entrapment hearing."

XIV.  Petitioner was denied his state and federal constitutional due process and equal protection rights to a fair trial where the prosecution and state courts knowingly used perjured testimony that went uncorrected with a calculated method to obtain a conviction that warrants a new trial due to such recanting by a key prosecution witness, entrapment hearing, and remand to vacate the current judgment.

XV.  Petitioner was denied his state and federal constitutional guaranteed due process and equal protection rights to effective assistance of appellate counsel who failed to perfect an appeal of right to non-frivolous claims, failed to consult with Petitioner prior to filing the appeal that was fatally defective, fatally flawed, and prejudiced the appeal, that warrants a remand back to the trial court to expand the record and an evidentiary hearing.

XVI.  Petitioner was denied his state and federal constitutional due process and equal protection rights to effective assistance of appellate counsel who filed a defective Anders brief, did not file the adequate and proper appellate motions for remand back to the trial court in the Michigan Court of Appeals that prejudiced Petitioner on appeal, that is a structural error and conflict of interest that warrants a remand and an evidentiary hearing.

XVII.  Petitioner's conviction and judgment rest upon extrinsic fraud upon the courts, plain error, structural errors, structural defects, clearly erroneous evidentiary rulings and "divided court" where the state court's decision is unreasonable, and contrary to federal law and United States Supreme Court decisions that violate Petitioner's substantive due process and equal protection guaranteed constitutional rights, that warrants this court to vacate the current judgment and sentence and remand this case for a new trial and evidentiary hearing.

XVIII.  Petitioner was denied his state and federal due process and equal protection guaranteed constitutional rights to fair trial, where the trial court jury instructions were defective to material facts of the case, abused its discretion to admitting evidence, video, to what the proponents stated it was, invaded the province of the jury and impaired Petitioner's right to present a complete defense and had an injurious effect on the jury verdict that is a plain error, structural error that warrants a reversal and remand for new trial.

(Pet'r's Mot. for Stay, ECF No. 6, PageID.253–255.)

7

In an order (ECF No. 12) entered on July 12, 2018, the Court granted Petitioner's motion to stay and provided him 30 days in which to file a motion for relief from judgment in the Kent County Circuit Court that set forth any unexhausted claims that he intended to pursue in his habeas proceedings. (*Id.*, PageID.269.) The Court stayed proceedings until Petitioner filed a motion to amend his § 2254 petition to include any subsequently exhausted claims and advised Petitioner that such a motion must be filed no later than "30 days after a final decision by the Michigan Supreme Court on Petitioner's unexhausted claims." (*Id.*, PageID.270.)

On December 14, 2020, Petitioner requested an extension of the 30-day deadline for filing his motion for relief from judgment. (Pet'r's Mot. to Extend, ECF No. 13.) By order (ECF No. 14) entered on July 30, 2018, the Court granted Petitioner's motion, extending the deadline until October 29, 2018. Petitioner, however, failed to meet that deadline. He filed his motion for relief from judgment with the Kent County Circuit Court on November 1, 2018.[1] (ECF No. 23-1, PageID.384.) On February 19, 2019, the trial court denied Petitioner's motion for relief from judgment because Petitioner had failed to show cause for the failure to raise his issues on direct appeal, or prejudice. (ECF No. 23-17, PageID.771–774.) Petitioner then waited more than a year before filing his application for leave to appeal the circuit court's decision. The court of appeals did not deny leave to appeal; rather, it dismissed the application on April 7, 2020, because Petitioner had filed it too late under the court rule. (ECF No. 23-20, PageID.1174.) The Michigan

---

[1] Petitioner does not enjoy the benefit of the mailbox rule in the state courts in connection with his motion for relief from judgment. *See Julian v. Parish*, No. 19-1053, 2019 WL 7567196, at *1 (6th Cir. Apr. 24, 2019) ("[T]here is no mailbox rule under Michigan law, and the federal court mailbox rule does not apply to state court proceedings.").

Supreme Court subsequently denied Petitioner's application for leave to appeal on November 24, 2020. (ECF No. 23-22, PageID.1637.)

Under the Court's initial stay order, Petitioner's motion to amend was due on or before Thursday, December 24, 2020. On December 14, 2020, Petitioner filed a motion to extend that deadline because he was not able to use the law library because of COVID-19 restrictions. (Pet'r's Mot. to Extend, ECF No. 15.) In an opinion and order (ECF Nos. 17, 18) entered on January 5, 2021, the Court denied Petitioner's motion for an extension of time and lifted the stay previously imposed. In doing so, the Court noted that it would be futile to extend the time within which Petitioner could amend his § 2254 petition because his procedural default would "preclude this Court's consideration of the merits of the claims Petitioner presented in his motion for relief from judgment." (ECF No. 17, PageID.286.)

## II.     Procedural Default

There are two types of procedural default. First, procedural default can occur pursuant to state law. When a state law default prevents further consideration of a federal issue by the state, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether (1) the petitioner failed to comply with an applicable state procedural rule, (2) the state court enforced the rule so as to bar the claim, and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004). To determine whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291–92 (6th Cir. 2010).

Second, procedural default may occur if Petitioner failed to raise a federal issue in the state courts. Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. *See* 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275–78 (1971). Failure to fairly present an issue to the state courts is a problem only if a state court remedy remains available for the petitioner to pursue. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). If no further state remedy is available, the petitioner's failure to exhaust does not bar relief, but the claim may be procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996).

If a petitioner procedurally defaulted his federal claim, the petitioner must demonstrate either (1) cause and prejudice—cause for his failure to comply with the state procedural rule (or fairly present the issue in the state courts) and actual prejudice flowing from the violation of federal law alleged in his claim—or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986); *Hicks*, 377 F.3d at 551–52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536–37. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

### A.    Grounds X through XVIII

As noted above, this matter was initially stayed to allow Petitioner to return to state court to file a motion for relief from judgment raising grounds for relief X through XVIII, set forth above. Petitioner was directed to file a timely motion to amend to include any subsequently exhausted claims after the completion of state court remedies. (ECF No. 12.) As detailed above, however, Petitioner never filed a motion to amend. Given Petitioner's failure to do so, grounds X through XVIII are not properly before the Court. Moreover, for the thorough reasons provided in the Court's January 5, 2021, opinion (ECF No. 17) Petitioner's procedural default—his failure to timely appeal from the trial court's denial of his motion for relief from judgment—precludes this Court's consideration of the merits of grounds X through XVIII. (*Id.*, PageID.284–286.) Grounds X through XVIII will, therefore, be summarily dismissed.

### B.    Grounds II and VIII

Respondent contends that habeas ground II is procedurally defaulted because Petitioner "failed to comply with a state procedural rule that requires defendants to make an offer of proof in the trial court demonstrating that severance is necessary to rectify *potential* prejudice, else *actual* prejudice must be shown on appeal." (ECF No. 22, PageID.322.) As the court of appeals noted, because Petitioner "did not move for a severance before trial, he [was] only entitled to relief if he demonstrated that having a joint trial was prejudicial." (ECF No. 23-18, PageID.780 (citing *People v. Hana*, 447 Mich. 325, 346–47; 524 N.W.2d 682 (1994).)

Only a procedural rule that was "'firmly established and regularly followed' by the time as of which it [was] to be applied" will support application of this doctrine. *Ford v. Georgia*, 498 U.S. 411, 424 (1991). "For a habeas claim to be procedurally defaulted on the basis of a state procedural rule, the petitioner must have violated a procedural rule, but the state court must also

have based its decision on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000). The Eastern District of Michigan has suggested that a petitioner's failure to move for a severance prior to trial falls within the rule requiring defendants to "object in the trial court before raising their claims on appeal." *Phillips v. Berghuis*, No. 11-13386, 2014 WL 1377659, at *4–5 (E.D. Mich. Apr. 8, 2014). Unlike in that matter, however, Petitioner here raised the severance issue as part of his motion for a new trial. Respondent has not provided, and the Court has not located, any case law suggesting that a petitioner who fails to move for severance before trial but asserts prejudice from such following trial has procedurally defaulted such a claim. The Court, therefore, declines to conclude that habeas ground II is procedurally defaulted and will consider the merits of Petitioner's claim below.

Respondent also contends that habeas ground VIII is procedurally defaulted because of a "state procedural rule that requires defendants to forego appellate review of an issue after consenting to the alleged error in the trial court." (ECF No. 22, PageID.362.) The court of appeals determined that this ground was waived because "defense counsel expressed satisfaction with the jury instructions" and, therefore, there was no error to review. (ECF No. 23-18, PageID.784.) The court of appeals cited to *People v. Kowalski*, in which the Michigan Supreme Court held that "[o]ne who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v. Kowalski*, 803 N.W.2d 200, 211 (Mich. 2011) (quoting *People v. Carter*, 612 N.W.2d 144, 149 (Mich. 2000)). This rule is adequate and independent because it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford*, 498 U.S. at 423–24).

12

Because ground VIII is procedurally defaulted, Petitioner must demonstrate either (1) cause and prejudice, or (2) that a lack of federal habeas review will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536; *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 495–96. Factors that may establish cause include interference by officials, attorney error rising to the level of ineffective assistance of counsel, and a showing that the factual or legal basis for a claim was not reasonably available. *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004) (quoting *McCleskey*, 499 U.S. at 493–94) (quotations omitted)). Here, Petitioner asserts neither cause and prejudice nor a fundamental miscarriage of justice. Petitioner, therefore, cannot overcome his procedural default of his eighth ground for relief. While habeas ground VIII is subject to dismissal on this basis alone, the Court will also consider the merits of Petitioner's claim below.

## III.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020)

(quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching

14

outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d

15

at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.   Discussion

### A.   Trial Court's Admission of Evidence

In his first ground for relief, Petitioner contends that the trial court erred by admitting into evidence a "rap" video. (ECF No. 1, PageID.8.) Petitioner argues that this evidence was not relevant, was more prejudicial than probative, and violated his due process right to a fair trial. (*Id.*)

On appeal, the Michigan Court of Appeals concluded that the "trial court abused its discretion in holding that the rap video was relevant to Slaughter-Butler's intent because it was a celebration, by the participants, of the commission of violent crimes and robberies." (ECF No. 23-18, PageID.776.) The court of appeals went on to find, however, that the video was relevant because it "showed a connection between the testifying codefendants and Slaughter-Butler and because Latham and Hureskin attributed an apparent greater culpability to Slaughter-Butler than to Overstreet," making it "more likely than not that Latham and Hureskin were testifying truthfully and accurately." (*Id.*) While the court of appeals did note that the video was highly inflammatory because of its lyrics, it concluded that the admission of the video was not unfairly prejudicial under Michigan Rule of Evidence 403 because the "hard to understand rap video was only played once at trial and its purpose for admission limited." (*Id.*, PageID.777.) The court of appeals also rejected Petitioner's argument that the admission of the video, which he likened to "gang affiliation" evidence, violated his right to due process. (*Id.*, PageID.778.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no

part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67–68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000). Thus, to the extent that Petitioner asserts that the state courts erred under Michigan law, he fails to state a claim upon which habeas relief may be granted. State courts are the final arbiters of state law, and the federal courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000); *see also Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (stating that, to obtain habeas relief based on an allegedly improper evidentiary ruling, a petitioner must identify "a Supreme Court case establishing a due process right with regard to the *specific kind of evidence* at issue"). Petitioner has not met this high standard.

Petitioner fails to identify any clearly established Supreme Court precedent that would preclude admission of the rap video. Certainly, the Supreme Court has concluded that admission of somewhat similar evidence, evidence regarding a defendant's membership in a gang, is constitutional error, but only "where the evidence has no relevance to the issues being decided in the proceeding." *Dawson v. Delaware*, 503 U.S. 159, 160 (1992). Here, the Michigan Court of Appeals concluded that the evidence had relevance to the issues being decided in the proceeding, specifically, the court found that "the rap video had a tendency to make it more likely than not that a close connection or a relationship existed between the testifying codefendants and Slaughter-Butler that did not exist between Latham, Hureskin, and Overstreet." (Mich. Ct. App. Op., ECF No. 23-18, PageID.776.) The court further found that, for that reason, "the rap video had a tendency to make it more likely than not that Latham and Hureskin were testifying truthfully and accurately." (*Id.*) Because the credibility of the testifying codefendants was an issue of consequence at Petitioner's trial, the evidence was relevant. Therefore, its admission is not contrary to *Dawson*. Because Petitioner has failed to show that the admission of the rap video was contrary to, or an unreasonable application of, clearly established federal law, he is not entitled to habeas relief on this ground.

### B.    Denial of New Trial Based on Co-Defendant's Counsel's "Finger-Pointing"

As his second ground for relief, Petitioner contends that the trial court abused its discretion by denying his motion for a new trial, in which he argued that the trials should have been severed. (ECF No. 1, PageID.9.) Petitioner contends that at trial, counsel for his co-defendant pointed his finger at Petitioner and accused him, even though no motion to sever had been filed. (*Id.*) The court of appeals rejected Petitioner's claim, stating:

18

Slaughter-Butler argues that the trial court erred when it denied his motion for a new trial, which was based on the "finger-pointing of Overstreet's counsel during closing arguments. We review a trial court's decision on a motion for a new trial for an abuse of discretion. *People v. Rao*, 491 Mich 271, 278; 815 NW2d 105 (2012).

Codefendants may be tried in a joint trial. See MCR 6.121(A). They do not have an absolute right to separate trials. *People v. Bosca*, 310 Mich App 1, 44; 871 NW2d 307 (2015). However, "[o]n a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that the severance is necessary to avoid prejudice to substantial rights of the defendant." MCR 6.121(C). Because Slaughter-Butler did not move for a severance before trial, he is only entitled to relief if he demonstrated that having a joint trial was prejudicial. See *People v. Hana*, 447 MIch 325, 346–347; 524 NW2d 682 (1994).

Slaughter-Butler claims that the "finger-pointing" of Overstreet's counsel prejudiced him because it could have only been derived from conversations between Overstreet's counsel and Overstreet. This claim is not supported by the record, which does not indicate the substance of any conversations between Overstreet and his counsel. Moreover, nothing on the record suggests that the statement of Overstreet's counsel that the "skinny and frail" man seen by Harris "turns out to be" Slaughter-Butler was based on anything but the evidence presented. Harris testified that the last man who carried a rifle had a very thin build and was the tallest of the four men. Notably, the jury had a chance at trial to observe Slaughter-Butler. In addition, Latham testified that Slaughter-Butler took an AK-47 into the basement, and Hureskin testified that Slaughter-Butler had a rifle. Furthermore, in his closing argument, the prosecutor had already argued that the man whom Harris saw carrying the rifle was Slaughter-Butler. Thus, even absent the statement of Overstreet's counsel that the "skinny and frail" man seen by Harris was Slaughter-Butler, Slaughter-Butler still needed to defend an argument that the evidence showed that he was the man who came into the basement with an AK-47. Slaughter-Butler was not prejudiced by the statement of Overstreet's counsel. Because there was no prejudice to Slaughter-Butler, the trial court did not abuse its discretion by denying his motion for a new trial.

(ECF No. 23-18, PageID.780–781.)

There is no due process right to a trial separate from one's co-defendants; instead, the propriety of severance is generally governed by state law. *See* Mich. Ct. R. 6.120, 6.121; *Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002). "[A] state trial court's alleged abuse of discretion [in denying severance], without more, is not a constitutional violation." *Stanford v. Parker*, 266 F.3d

19

442, 459 (6th Cir. 2001). "Misjoinder is unconstitutional only if it results in prejudice so great as to deny a defendant his due process right to a fair trial." *LaMar v. Houk*, 798 F.3d 405, 428 (6th Cir. 2015) (citing *United States v. Lane,* 474 U.S. 438, 446 n.8 (1986)).

The Supreme Court has delineated few constitutional rules in this area. The Court has held that separate trials are constitutionally required where the prosecution intends to introduce the confession of a co-defendant that incriminates another defendant. *See Bruton v. United States*, 391 U.S. 123, 137 (1968). The *Bruton* rule is designed to vindicate a defendant's right to confront his accusers, so separate trials are not necessary when the co-defendant is subject to cross-examination. There was no Confrontation Clause problem during Petitioner's trial because neither defendant confessed, and thus neither defendant's confession could be used without cross-examination to incriminate the other.

Beyond the *Bruton* rule, the Supreme Court has left the matter of severance to state law and the trial judge's discretion. The Court remarked in *United States v. Lane*, 474 U.S. 438 (1986), that the denial of a motion for severance does not in and of itself implicate constitutional rights. Consequently, a "petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendants bears a very heavy burden." *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001).

In *Zafiro*, the joined co-defendants challenged the failure to sever because they offered conflicting defenses. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The Supreme Court declined to adopt a "bright line" rule requiring severance whenever co-defendants have conflicting defenses. *Id.* at 538. "Mutually antagonistic defenses are not prejudicial *per se*." *Id.* at 538–39. For example, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the

tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* at 538–39. The Supreme Court noted that "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* However, the Sixth Circuit recognizes *Zafiro* is based on the Federal Rules of Criminal Procedure, not constitutional grounds. *See Phillips v. Million*, 374 F.3d 395, 398 (6th Cir. 2004) ("*Zafiro* involved the interpretation of Federal Rules of Criminal Procedure 8, 14, and 18, not the United States Constitution. *Zafiro* thus has no precedential weight in reviewing state court proceedings on due process grounds. . . ."). Thus, while *Zafiro*'s value as precedent in the habeas context is limited, the Court's analysis can be instructive.

Petitioner complains that Overstreet's counsel, during closing argument, pointed a finger at Petitioner when mentioning that the rifle-bearing shooter was "skinny and frail." (Trial Tr. V, ECF No. 29-1, PageID.1705.) The transcript does not reflect that visual action, but Petitioner's counsel insisted that Overstreet's counsel actually pointed to Petitioner. (Mot. for New Trial Tr., ECF No. 23-13, PageID.697.) Petitioner's counsel argued that Petitioner was prejudiced by the finger-pointing. The finger-pointing may have been prompted by some confusion regarding the physical characteristics of the men who committed the crimes and whether each man fired shots. Victim Kevin Harris testified that four men entered the basement with guns, three with handguns and one with a rifle (Trial Tr. II, ECF No. 23-7, PageID.578); but, to his knowledge, only three fired their weapons, two of the men with handguns and the one man with the rifle (*Id.*, PageID.582). It was not clear whether the man with the rifle, described as tall and skinny, was the third man or the fourth man. (*Id.*, PageID.583.)

"Hostility among defendants or the attempt of one defendant to save himself by inculpating another does not require that defendants be tried separately." *United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014) (quoting *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir.1992)). "The

21

mere fact that each defendant 'points the finger' at another is insufficient; the defendant must show that the antagonism confused the jury." *United States v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988). There is nothing to suggest such confusion here. Harris testified that the rifle shooter was tall and skinny. That description apparently matched Petitioner's physical characteristics, not Overstreet's. The prosecutor emphasized that point during his closing argument. Moreover, the other two men who entered the basement identified both Petitioner and Overstreet as participating in the crime.

Here, Petitioner simply fails to identify how the "finger-pointing" deprived him of fundamental fairness, particularly in light of the testimony of the other perpetrators and the fact that the prosecutor had already argued that Petitioner was the man whom Harris saw carrying the rifle. Petitioner has failed to demonstrate that the state court's resolution of this issue is contrary to, or an unreasonable application of, clearly established federal law. Therefore, he is not entitled to relief on habeas ground II.

### C.      Entitlement to New Trial Based on New Evidence

In habeas ground III, Petitioner contends that the trial court should not have denied his motion for a new trial without holding an evidentiary hearing because one of the principal witnesses subsequently recanted his testimony. (ECF No. 1, PageID.11.) As noted by the court of appeals, the "newly discovered evidence was Latham's recanted testimony." (ECF No. 23-18, PageID.781.) Essentially, Petitioner maintains that he is actually innocent based upon Latham's recantation.

Petitioner's claim of actual innocence fails to state a cognizable federal claim. In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court stated: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." But the *Herrera* Court did not close the door completely, stating in dicta: "in a capital

case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House*, 547 U.S. at 555 ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

Two years after *Herrera,* the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup*, 513 U.S. at 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which

can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and a substantive or "free-standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412. In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claim is without merit. The Sixth Circuit repeatedly has held that free-standing claims of actual innocence are not cognizable on habeas corpus review. *See Smith v. Nagy*, 962 F.3d 192, 206 (6th Cir. 2020) (citing *Schlup* and *Herrera*); *Cress*, 484 F.3d at 854 (citing cases). Even if Petitioner could invoke this exception and obtain habeas relief on his freestanding innocence claim, he would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. Petitioner fails the first requirement. This is not a capital case, and thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case."). Petitioner, therefore, cannot obtain habeas corpus relief on his freestanding claim of actual innocence.

### D. Ineffective Assistance of Counsel

In *Strickland*, 466 U.S. at 668, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within

24

the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel*, 350 U.S. at 101); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

With respect to Petitioner's ineffective assistance claims, the court of appeals set forth the following standard of review:

> To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonableness, and that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *People v. Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). "'A reasonable

probability is a probability sufficient to undermine confidence in the outcome.'"
*People v. Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (citation omitted).

(ECF No. 23-18, PageID.779.) Although the court of appeals cited state court authority for the standard, the standard applied is identical to *Strickland*. Moreover, if one looks to *Uphaus* and *Carbin* and the cases cited therein in support of the standard, eventually the source of the standard is identified as *Strickland*. *See People v. Toma*, 613 N.W.2d 694, 703 (Mich. 2000); *see also Carbin*, 623 N.W.2d at 889. Thus, there is no question that the state court applied the correct standard. This Court, therefore, will consider whether the court of appeals' application of that standard was unreasonable with respect to Petitioner's multiple claims of ineffective assistance.

### 1.      Lack of Cross-Examination

In habeas ground IV, Petitioner alleges that counsel was ineffective for failing to cross-examine witnesses, preventing him from "placing before the jury facts from which bias, prejudice, or lack of credibility . . . could be inferred." (ECF No. 1, PageID.12.) "Decisions as to whether to call certain witnesses or what evidence to present are presumed to be matters of trial strategy, and the failure to call witnesses or present evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense." *Collins v. Berghuis*, No. 1:08-cv-369, 2011 WL 4346333, at *16 (W.D. Mich. Aug. 22, 2011) (citing *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004) and *Hutchison*, 303 F.3d at 749).

The court of appeals rejected Petitioner's claim, stating:

Slaughter-Butler claims that defense counsel was ineffective for failing to cross-examine Latham and Hureskin about their bias toward him, which resulted after Eddie Moore and Patrick Grover, his cousins, planned to testify against them. Nothing on the record indicates that any cross-examination of Latham and Hureskin about Moore and Glover would have resulted in evidence suggesting that Latham and Hureskin gave false testimony. Accordingly, Slaughter-Butler has failed to overcome the strong presumption that defense counsel's performance in cross-examining Latham and Hureskin was sound trial strategy. *Carbin*, 463 Mich at 600.

> Slaughter-Butler also argues that defense counsel was ineffective for failing to cross-examine Harris about inconsistencies in his testimony and his previous descriptions of the suspects. Slaughter-Butler does not identify any statements by Harris that were inconsistent with his trial testimony. A defendant may not leave it to this Court to search for a factual basis to sustain his position. *People v. Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). Consequently, Slaughter-Butler has failed to overcome the strong presumption that defense counsel's performance in cross-examining Harris was sound trial strategy. *Carbin*, 463 Mich at 600.

(ECF No. 23-18, PageID.781–782.)

With respect to Petitioner's argument regarding counsel's cross-examination of Latham and Hureskin, the court of appeals correctly noted that nothing in the record indicates that these individuals testified against Petitioner because of his cousins' knowledge or that they even know of his cousins' knowledge. Moreover, the record reflects that Petitioner's counsel cross-examined Latham about his plea agreement to show bias, eliciting testimony that the more Latham testified, the better his deal would be. (ECF No. 23-8, PageID.625.) Counsel also cross-examined Hureskin, noting that he had initially been charged with perjury because of the testimony he had provided at the investigative subpoena hearing. (ECF No. 23-9, PageID.655.) Counsel had Hureskin admit that the perjury charge had been dismissed as part of his plea bargain. (*Id.*) Essentially, counsel asked Hureskin why his testimony during trial should be believed when he perjured himself before. (*Id.*, PageID.655–656.)

With respect to Petitioner's claim regarding counsel's cross-examination of Harris, the record reflects that during cross-examination, Petitioner's counsel elicited the fact that Harris had not been truthful with the officers on the night of the shooting. (ECF No. 23-7, PageID.584.) Moreover, counsel questioned Harris about his prior statement, during co-defendant Foster's trial, that the "fourth guy was tall and lanky." (*Id.*) Counsel asked about that prior statement because Harris testified during the preliminary hearing that the "third one" shooting was "lanky." (*Id.*) While Petitioner has not identified which specific statements Harris made that were inconsistent

27

with his trial testimony, it appears that counsel did in fact question Harris about at least one prior inconsistent statement. Petitioner has not demonstrated that the court of appeals' determination regarding this ground for relief was contrary to, or an unreasonable application of, *Strickland*. Accordingly, habeas ground IV will be dismissed.

### 2.      Failure to Investigate Evidence

In his second claim of ineffective assistance, Petitioner contends that counsel failed to investigate evidence presented at trial. (ECF No. 1, PageID.14.) Petitioner contends that this evidence prejudiced him and violated his Fourteenth Amendment equal protection rights. (*Id.*)

### a.      Telephone Records

Petitioner first contends that counsel was ineffective for failing to discern that there was no search warrant for his telephone records and for failing to object to the admission of such records. (ECF No. 1-1, PageID.135–136.) According to Petitioner, discovery provided to the defense never "listed . . . any warrant every being issued for [his] cell phone number." (*Id.*, PageID.135.) The court of appeals rejected Petitioner's claim, nothing that "because nothing in the record indicates that the police did not obtain a warrant for the telephone records, Slaughter-Butler has failed to establish the factual predicate for his claim." (ECF No. 23-18, PageID.782.)

Nothing in the record before the Court support's Petitioner's assertion that the police did not obtain a warrant for the telephone records. Moreover, during cross-examination, Detective Boillat acknowledged that the records tracked devices, not people, and that the records only gave an indication of where a certain device was located. (ECF No. 23-9, PageID.646.) The evidence regarding cell phone records were not a crucial part of the prosecution's case against Petitioner. Petitioner, therefore, has not demonstrated that counsel rendered ineffective performance by failing to object to the admission of the records. *See Collins*, 2011 WL 4346333, at *16.

### b.      Failure to Interview Expert

Petitioner next alleges that counsel was ineffective for failing to interview the police expert

who provided expert testimony about the analysis of cellular telephone records and the analysis of

Petitioner's records. (ECF No. 1-1, PageID.136.) With respect to this claim, the court of appeals

wrote:

> Additionally, Slaughter-Butler claims that defense counsel was ineffective because
> he failed to interview Detective Erik Boillat, who was qualified as an expert in the
> analysis of cellular telephone records and testified about Slaughter-Butler's
> records. But, nothing in the record establishes that defense counsel did not
> interview Boillat. Slaughter-Butler has again failed to establish the factual predicate
> for his claim, so it is without merit.

(ECF No. 23-18, PageID.782.) Petitioner again provides no support for his assertion that counsel

did not interview Detective Boillat, nor does he provide any facts regarding what he believes such

an interview would have elicited. Petitioner's vague and conclusory allegations do not entitle him

to relief. *See Post v. Bradshaw*, 621 F.3d 406, 419 (6th Cir. 2010) (absent articulation of factual

contentions to support ineffective assistance claim, a petitioner has no entitlement to relief).

### c.      Failure to Obtain Independent Expert

Petitioner also contends that counsel was ineffective for failing to hire an independent

expert "to examine cell phone records for [the] defense to testimony on [his] behalf at trial." (ECF

No. 1-1, PageID.136.) The court of appeals rejected this claim, noting that Petitioner had not

demonstrated that he was deprived of a substantial defense because nothing in the record indicated

how a witness would have testified at trial. (ECF No. 23-18, PageID.782.) Once again, Petitioner's

vague and conclusory allegation does not entitle him to relief. *See Post*, 621 F.3d at 419.

In sum, Petitioner has not demonstrated that the court of appeals' determination regarding

this ground for relief was contrary to, or an unreasonable application of, *Strickland*. Accordingly,

Petitioner is not entitled to relief on habeas ground V.

### 3.      Failure to Request Voluntary Manslaughter Instruction

In habeas ground VI, Petitioner contends that trial counsel rendered ineffective assistance

by failing to request that the trial court instruction the jury regarding voluntary manslaughter.

(ECF No. 1, PageID.15.) The court of appeals rejected Petitioner's claim, stating:

> Slaughter-Butler next claims that defense counsel was ineffective for failing to
> request an instruction regarding voluntary manslaughter, which is a necessarily
> lesser included offense of murder. *People v. Mendoza*, 468 Mich 527, 541; 664
> NW2d 685 (2003). Thus, when a defendant is charged with murder, the jury must
> be instructed on voluntary manslaughter if the instruction is supported by a rational
> view of the evidence. *Id.* To prove voluntary manslaughter, "one must show that
> the defendant killed in the heat of passion, the passion was caused by adequate
> provocation, and there was not a lapse of time during which a reasonable person
> could control his passions." *Id.* at 535. The element that distinguishes murder from
> manslaughter is malice. *Id.* at 540. Even though there was some evidence that the
> shooting did not start until after Cherry reached for his gun, a rational view of the
> evidence does not support an instruction on voluntary manslaughter. The evidence
> showed that the four men who entered the basement intended to rob Cherry and that
> each of them was armed and had his weapon out when entering the basement.
> Regardless of how the shooting actually started, the four men, by committing an
> armed robbery of a drug dealer, acted, at a minimum, with the intent to create a
> very high risk of death or great bodily harm with knowledge that death or great
> bodily harm was the probable result. *See* [*People v.*] *Carines*, 460 Mich. [750,]
> 759[, 597 N.W.2d 130 (1999)]. Because a rational view of the evidence did not
> support an instruction for voluntary manslaughter, any request for an instruction on
> voluntary manslaughter would have been futile. Defense counsel was not
> ineffective for failing to make the futile request. *Unger*, 278 Mich App at 256–257.

(ECF No. 23-18, PageID.782.)

The Michigan Court of Appeals' determination that the voluntary manslaughter instruction

was not supported under state law is axiomatically correct. As the Supreme Court explained in

*Estelle*, "it is not the province of a federal habeas court to re-examine state-court determinations

on state-law questions." 502 U.S. at 67–68. The decision of the state courts on a state-law issue is

binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw*

*v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of

state law, including one announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus."). For counsel to insist on the instruction as a matter of state law, therefore, would have been meritless. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

Counsel's insistence on the instruction as a matter of federal constitutional law would have fared no better. "[T]he Constitution does not require lesser-included offense instructions in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *see also Goodwin v. Johnson*, 632 F.3d 301, 317–18 (6th Cir. 2011) (concluding that counsel was not ineffective for failing to request an involuntary manslaughter instruction because a rational view of the evidence did not support such an instruction). Habeas ground VI will, therefore, be dismissed.

### 4. Failure to Object to Evidence and Prosecutorial Misconduct

In habeas ground VIII, Petitioner alleges that counsel was ineffective for failing to object to prejudicial evidence and prosecutorial misconduct. (ECF No. 1, PageID.17.) Specifically, Petitioner alleges that counsel failed to: (1) object to the admission of the police dispatch call; (2) object to the prosecution vouching for credibility of witnesses; and (3) failed to object to the prosecutor's "civic duty" assertion during closing arguments. (ECF No. 1-1, PageID.142–147.)

Overall, for claims of prosecutorial misconduct, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Court has emphasized a series of factors to be evaluated when making this determination: (1) whether the comments were isolated or pervasive; (2) whether the comments were deliberately or accidentally put before the jury; (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence; (5) the strength of the overall proof establishing guilt; (6) whether the remarks were objected to by counsel; and (7) whether a curative instruction was given by the court.

*See id.* at 182–83; *United States v. Young*, 470 U.S. 1, 12–13 (1985); *Donnelly*, 416 U.S. at 646–47. With this background in mind, the Court considers each of Petitioner's arguments below.

### a.    Admission of Police Dispatch Call

Petitioner contends that counsel should have objected to the admission of the 911 police dispatch call because "it was played only to arouse the sympathy of the jury for the victims and the deceased['s] family." (ECF No. 1-1, PageID.146.) Petitioner asserts that there was "never any dispute that Jason Cherry was killed while his parents were home." (*Id.*, PageID.142.) In rejecting Petitioner's claim, the court of appeals stated:

> Slaughter-Butler also claims that defense counsel was ineffective for failing to object to the recording of the 911 telephone call because it was irrelevant and only introduced to elicit an emotional response from the jury. The recording of the 911 telephone call was relevant. Because Slaughter-Butler was charged with felony murder, the prosecutor needed to prove that there was a killing of a human being. *Carines*, 460 Mich at 759. Cherry's father testified that his wife called 911 after he heard gunshots. The 911 telephone call, in which Cherry's mother told the 911 operator that there had been a shooting in the house and Cherry was dead, had a tendency to make the existence of consequential facts—whether and when Cherry was killed—more probable than it would be without the evidence. MRE 401. Although the recording of the 911 telephone call was relevant, its probative value was minimal. Several witnesses who were present in the basement when Cherry died testified at trial. And, in fact, the 911 call did not provide any details about Cherry's death. Additionally, the recording carried a risk of injecting considerations extraneous to the merits of the lawsuit, such as affecting the jury's emotions or sympathies: The jury heard Cherry's mother nearly immediately upon learning that her son had been shot and was dead. See *People v. Pickens*, 446 Mich 298, 337; 521 NW2d 797 (1994). Nonetheless, defense counsel was not ineffective for failing to object. Slaughter-Butler did not dispute that Cherry was killed; he only disputed whether he was one of the men who entered the basement. The 911 telephone call in no way implicated Slaughter-Butler as one of those men. Moreover, the emotion Cherry's mother displayed was not beyond what one would expect from a mother who just learned that her son had been shot dead. The jury was instructed that it was not to let sympathy or prejudice influence its decision. Under these circumstances, defense counsel's performance in failing to object to the recording of the 911 call did not fall below objective standards of reasonableness. *Uphaus*, 278 Mich App at 185.

(ECF No. 23-18, PageID.782–783.)

The court of appeals' rejection of this claim did not constitute an unreasonable application of *Strickland*. Counsel is not required to raise futile or meritless objections. *See Richardson v. Palmer*, 941 F.3d 838, 857 (6th Cir. 2019). Moreover, even if the 911 call had been objected to and not admitted, the prosecution presented overwhelming evidence to support the jury's findings of guilt. Petitioner, therefore, fails to demonstrate "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### b.      Vouching

Petitioner also asserts that counsel should have objected to the prosecutor's improper vouching when the prosecutor "led accomplices to testify that their plea agreement was lesser time for truthful testimony." (ECF No. 1-1, PageID.143.) Petitioner suggests that the prosecutor essentially implied a personal belief in the accomplices' testimony. (*Id.*) The court of appeals rejected Petitioner's argument as follows:

> Slaughter-Butler also argues that defense counsel was ineffective when he failed to object when the prosecutor improperly elicited testimony from Latham and Hureskin that their plea agreements required them to testify truthfully. A prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness. *People v. Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). But merely referring to a plea agreement that also contains a promise of truthful testimony does not warrant reversal. *People v. Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). Rather, the admission of evidence of such an agreement is error when the prosecution uses it to suggest that the government has special knowledge that is not known by the jury that the witness was testifying truthfully. *Id.*
>
> The prosecutor's elicitation of testimony from Latham and Hureskin that each entered into a plea agreement that required truthful testimony was not misconduct. *Id.* Accordingly, any objection would have been futile, and defense counsel was not ineffective for failing to raise a futile objection. *Unger*, 278 Mich App at 256–257.
>
> In so ruling, we note that in his closing and rebuttal arguments, the prosecutor mentioned that Latham's and Hureskin's plea agreements required them to testify truthfully. Nevertheless, the prosecutor never suggested that he had special knowledge that was unknown to the jury that Latham and Hureksin, in fact, testified truthfully. Rather, whenever the prosecutor mentioned the plea agreements, he argued that Latham and Hureskin were credible because of the substance of their

testimony, i.e., they implicated their "brother" Slaughter-Butler and their testimony was consistent with and corroborated by other evidence. A prosecutor may comment on the credibility of his witnesses, especially when credibility is at issue. *Thomas*, 260 Mich App at 455. A prosecutor is free to argue from the evidence and reasonable inferences that a witness is credible. *Bahoda*, 448 Mich at 282; *People v. Bennett*, 290 Mich App. 465, 478; 802 NW2d 627 (2010). Accordingly, the prosecutor's remarks during closing and rebuttal arguments were proper, and any objection would have been futile. Defense counsel was not ineffective for failing to raise a futile objection. *Unger*, 278 Mich App at 256–257.

(ECF No. 23-18, PageID.783–784.)

The federal courts have recognized two types of objectionable vouching. *See United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019); *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008). *But see Wogenstahl v. Mitchell*, 668 F.3d 307, 328–29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to bolster his or her credibility. *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 2019); *United States v. Carroll*, 26 F.3d 1380, 1388–89 (6th Cir. 1994). The second type, occurs when the prosecutor invites the jury to believe there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965).

The Sixth Circuit has explored whether and when a prosecutor's reference to the requirement to testify truthfully in a plea agreement might rise to the level of vouching. Simply inquiring as to the existence of a term in the plea agreement regarding truthful testimony does not violate due process. *See United States v. Reid*, 625 F.3d 977, 984 (6th Cir. 2010) (concluding that "[b]ecause the prosecutor limited his questions and comments to th[e] facts [of the plea agreements] and did not imply any special knowledge regarding the credibility or truthfulness of the cooperating witnesses, the prosecutor did not improperly vouch for the witnesses."); *United States v. Presley*, 349 F. App'x 22, 26–27 (6th Cir. 2009) (finding no improper vouching where

the prosecutor "simply mentioned the existence of the plea agreements" with the witness but "did not imply that these agreements ensured that they were being truthful."); *United States v. Trujillo*, 376 F.3d 593, 608–09 (6th Cir. 2004) ("[T]he prosecutor did not offer any personal observations or opinions as to the veracity of [the witnesses], nor did she place the prestige of the Government behind their credibility. Rather, the prosecutor's questions and comments merely encompassed the terms of [the witnesses'] plea agreements. . . ."); *United States v. Tocco*, 200 F.3d 401, 416–17 (6th Cir. 2000) (introduction of plea agreement which contained requirement of truthful testimony, standing alone, was not improper); *Francis*, 170 F.3d at 550 ("We have allowed a prosecutor to refer to the plea agreement of a testifying witness . . . . The prosecutor may elicit testimony about its terms, attack the credibility of the witness because of it and even refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility.") (citation omitted).

The Sixth Circuit has noted that it is possible to stray beyond the permissible boundary of simply referencing the terms of the plea agreement, finding such a trespass in *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994). The court noted:

> [T]he prosecutor blatantly implied that the Patrick's [sic] plea agreements ensured that the witnesses were truthful; the prosecutor did not give the jury any inkling that the government has no independent means of discerning truthfulness. Further, the prosecutor placed the prestige of the government, and even of the court, behind the credibility of the Patricks, by stating that, if the government or the judge did not believe that the witnesses were being truthful, the witnesses would be in jeopardy. This implied to the jury that the government and the court were satisfied that the witnesses were truthful. This constitutes improper vouching.

*Id.* at 1389.

Here, the prosecutor at Petitioner's trial made no such comments. The court of appeals determined that the prosecutor had neither stated nor insinuated that the testimony given by Latham and Hureskin was truthful, and Petitioner does not contest that determination. Counsel,

therefore, was not ineffective for failing to raise a meritless objection to the prosecutor's statements. *See Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim.").

### c.    "Civic Duty" Argument

Petitioner also asserts that counsel should have objected to the prosecutor's "civic duty" appeal during his closing rebuttal argument. (ECF No. 1-1, PageID.146.) Petitioner takes issue with the following comments by the prosecutor:

> Today you are left with a heavy burden, I understand that. Today is the day that the Cherrys, Kevin Harris, George Woods, and Jashawn Tatum are seeking justice. You had a rare opportunity, a glimpse to see a mother feel the pain of the loss of her child immediately upon finding him. I can't imagine what life is like like that. I can't imagine moving forward knowing that. But today is the day they get to move forward. And the best way they can move forward is for justice to be served, and justice calls for one verdict, and that is guilty of both defendants on every count, and I'm asking you for that. Thank you.

(ECF No. 29-1, PageID.1711.)

Petitioner's claim that the prosecutor's statement presented a "civic duty" argument begs the question: what is a "civic duty" argument. There is no clearly established federal law on that point. The Supreme Court has frequently referenced jury service as a "civic duty," *see, e.g.*, *Dietz v. Bouldin*, 136 S. Ct. 1885, 1896 (2016) ("Juries are of course an integral and special part of the American system of civil justice. Our system cannot function without the dedication of citizens coming together to perform their civic duty and resolve disputes"), but the Court has never defined, or even commented on, "civic duty" arguments.

Although the Court has not mentioned "civic duty" arguments, it has commented on the dangers of prosecutorial argument that is "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." *Viereck v.*

*United States*, 318 U.S. 236, 247 (1943). The prosecutor's challenged argument in *Viereck* was as

follows:

> In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

> This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of a crime, just as much as they are relying upon the protection of the Men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.

> As a representative of your Government I am calling upon every one of you to do your duty.

*Id.* at 247 n.3. The *Viereck* Court went on to heartily condemn that argument:

> At a time when passion and prejudice are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks addressed to the jury where highly prejudicial, and that they were offensive to the dignity and good order with which all proceedings in court should be conducted. We think that the trial judge should have stopped counsel's discourse without waiting for an objection. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 [(1935)].

*Id.* at 248. Although the *Viereck* Court's statement may be stirring, and though it could provide

the foundation for a "civic duty" argument proscription, it is entirely dicta. The Court specifically

acknowledged that the "duty" argument was not the error that prompted reversal, but was simply

another issue that "might well have placed the judgment of conviction in jeopardy." *Id.* at 247.

This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655.

Labeling an argument a "civic duty" argument does not render that argument prosecutorial misconduct. The determination of impropriety requires going deeper; the deeper inquiry is whether the argument is irrelevant such that its only purpose would be to arouse passion and prejudice. The fact that the argument invites the jurors to satisfy a civic duty is relevant to that analysis, but it is not dispositive.

In *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991), the Sixth Circuit Court of Appeals considered exactly how the "civic duty" analysis fits within the more fundamental inquiry into whether the prosecutor has attempted to appeal to the jurors' passion or prejudice:

> Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not *per se* impermissible. *See Henderson v. United States*, 218 F.2d 14, 19–20 (6th Cir.), *cert. denied*, 349 U.S. 920 (1955).[2] Our determination of whether comments are calculated to incite prejudice and passion in the jury is informed by the Supreme Court opinion in *Viereck*.
>
> *   *   *
>
> The remarks in the instant case are analogous to the comments adjudged inflammatory and prejudicial in *Viereck*. The fairness or unfairness of comments appealing to the national or local community interests of jurors in a given instance will depend in great part on the nature of the community interest appealed to, and its relationship to, and the nature of, the wider social-political context to which it refers. The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice. The Supreme Court in *Viereck* framed the inquiry to incorporate both the purpose and effect of the comments. In that case, in the light of contemporaneous events, which had great impact on the emotions and perceptions of jurors, the remarks "could only have . . . arouse[d] passion and prejudice." *See id.* at 247.

_____

[2] Our holding in *Henderson* and the result reached in *Alloway* reflect a general rule followed by other circuits as well. In *United States v. Shirley*, 435 F.2d 1076 (7th Cir.1970), the Seventh Circuit stated that the prosecutor's closing remarks

concerning the increasing number of cars being stolen did not overstep the bounds of fairness and propriety and could not have worked a substantial injury to the defendant in denying him a fair trial because, even though the statements were not particularly relevant and had no bearing on the guilt or innocence of the defendant, the remarks did not contain an emotional appeal to the jurors' self-interest designed to arouse their prejudice against the defendant. *Id.* at 1079.

The Eighth Circuit has also stated, in a case where the prosecutor told the jurors that they were the public's last shield and the district court instructed the jury to disregard the remark, that unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible. *United States v. Lewis*, 547 F.2d 1030, 1036 (8th Cir.), *cert. denied*, 429 U.S. 1111 (1976). Similarly, the Eleventh Circuit, in *United States v. Kopituk*, 690 F.2d 1289, 1342–43 (11th Cir.1982), *cert. denied*, 463 U.S. 1209 (1983), stated that appeals to the jury to act as the conscience of the community, unless designed to inflame the jury, are not *per se* impermissible. However, the remarks complained of in *Kopituk* were found by the court to have approached the line demarcating impermissible comment calculated to incite the jury against the accused, but not to have crossed the line into the realm of impropriety and prejudice by directly suggesting that the jurors had personal stakes in the outcome of the case.

*Solivan*, 937 F.2d at 1151–52. The *Solivan* court went on to review several decisions where circuit courts of appeal had concluded that the argument crossed the line. For example in *United States v. Barker*, 553 F.2d 1013, 1024–25 (6th Cir. 1977), the court concluded that it was improper "for a prosecutor to suggest that unless the defendant was convicted it would be impossible to maintain 'law and order' in the jurors' community." *Solivan*, 937 F.2d at 1152. Additionally, the *Solivan* court referenced several cases where prosecutors had gone too far in suggesting that their role as jurors permitted them to do something about drug trafficking in their community. *Solivan*, 937 F.2d at 1152–53.

The *Solivan* court contrasted those cases—cases where the jury was asked to look beyond the evidence against a particular defendant and consider the impact of their verdict on societal problems generally—with the decision in *United States v. Alloway*, 397 F.2d 105 (6th Cir. 1968). In *Alloway*, the court considered the propriety of the following argument:

You, the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the

39

John Alloways know that this type of conduct will not be tolerated, that we're not
going to tolerate [armed robbery]. . . .

*Alloway*, 397 F.2d at 113. The *Solivan* court explained why the "conscience of the community"

argument in *Alloway* was acceptable while similar argument in *Barker* and *Solivan* was not:

> The comments by the prosecutor in *Alloway* and the comments complained of in
> the instant case are only vaguely similar. The remarks in this case appear to us to
> have been deliberately injected into the proceedings to incite the jury against
> defendant. Given the nature of this case, involving a cocaine transaction, and the
> wider social context which the prosecutor sought to bring to bear on the
> proceedings, the national drug problem, the purpose and effect of the comments
> could have only been to arouse passion and prejudice. *See Viereck*, 318 U.S. at 247.
> We determined that the statements made in *Alloway* were not deliberately injected
> into the proceedings to inflame the jury. *See* 397 F.2d at 113. Indeed, examined in
> the light of the nature of the case and the wider social context in which the case was
> prosecuted, it is clear that the government's statements in *Alloway* were devoid of
> the sort of inflammatory content inherent in the prosecutor's statements in this case
> precisely because there was no comparable specific wider context of national
> attention and concern present in *Alloway* pertaining to armed robbery. The
> comments in *Alloway* did not attempt to compare or to associate the defendant with
> a feared and highly publicized group, such as drug dealers, as did the prosecutor in
> this case. The prosecutor in *Alloway* did not go beyond a mere allusion to the
> general need to convict guilty people, as did the prosecutor in this case, and bring
> to bear upon the jury's deliberations the attendant social consequences of
> defendant's criminal conduct or urge the jury to convict an individual defendant in
> an effort to ameliorate society's woes.
>
> *  *  *
>
> In *Alloway*, we were presented with remarks by the prosecutor which alluded only
> to the general criminality of the defendant's conduct in robbing a bank and the
> general community need to convict guilty people. The comments at issue in
> *Alloway* constituted a general plea which did not even specifically refer to the crime
> of armed robbery. Moreover, armed robbery was not and is not the specific focus
> of national attention as is the drug problem. In the instant case, we find that *Alloway*
> is inapposite because, in this case, the prosecutor went beyond the scope of the
> prosecutor's statements in *Alloway*, which constituted a mere innocuous reference
> to the community or societal need to convict guilty people.

*Solivan*, 937 F.2d at 1154–55.[2] Neither *Solivan* nor *Alloway* are of particularly recent vintage, but just a few months ago, the Sixth Circuit relied on the analysis in *Solivan* and described it as "one of the most cited cases in this circuit regarding attorney appeals to the community conscience . . . ." *United States v. Hall*, 979 F.3d 1107, 1122 (6th Cir. 2020).

Here, in rejecting Petitioner's claim, the court of appeals wrote:

> Next, Slaughter-Butler claims that defense counsel was ineffective for failing to object when at the very end of his closing rebuttal argument, the prosecutor appealed to the jury's civic duty and sympathies. Assuming, but without deciding that the challenged remark was improper, we find that Slaughter-Butler has failed to overcome the strong presumption that defense counsel's performance in not objecting constituted sound trial strategy. *Carbin*, 460 Mich at 600. There are times when it is better not to object to an improper comment. *People v. Horn*, 279 Mich App 31, 40; 755 NW2d 212 (2008). Where the jury had listened to three closing arguments and a rebuttal closing argument, which included an argument by the prosecutor that the facts showed that defendants were guilty, defense counsel may have believed it was best not to object. Objecting may have prolonged the prosecutor's closing rebuttal argument and delayed the jury's receiving their final instructions. In sum, we conclude that defendant has failed to establish that defense counsel's performance fell below objective standards of reasonableness. *Uphaus*, 278 Mich App at 185.

(ECF No. 23-18, PageID.783.)

When considered against the backdrop of the prosecutorial arguments in *Solivan* and *Alloway*, it appears that the prosecutor's argument in Petitioner's case is more akin to the permissible *Alloway* argument. Nonetheless, the court of appeals assumed without deciding that the prosecutor's comments were improper. One could interpret the comments as an invitation to the jurors to find Petitioner (and Overstreet) guilty to provide justice for Cherry's family after his mother found Cherry dead shortly after the shooting. Nevertheless, the court of appeals posited

---

[2] The *Solivan* court also noted that "[t]he district court in *Alloway* subsequently instructed the jury to base its verdict solely on the evidence and to consider the prosecutor's argument only as it corresponded with the evidence." *Solivan*, 937 F.2d at 1154. But separate and apart from the remedial instruction, the Sixth Circuit concluded that the argument was not prosecutorial misconduct because it was not, by purpose or effect, intended to inflame the passion and prejudice of the jury.

that counsel may not have wanted to object to avoid prolonging closing arguments. "[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint." *United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006). Moreover, "any single failure to object [to closing arguments] usually cannot be said to have been error." *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006); *see also Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010) (finding that defense counsel's failure to object to one instance of alleged prosecutorial misconduct was not deficient). Petitioner, therefore, has not overcome the presumption that defense counsel acted reasonably in choosing not to object to the prosecutor's comments.

In sum, Petitioner has not demonstrated that the court of appeals' determination regarding this ground for relief was contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to relief on habeas ground VII.

### E.    Jury Instructions

As habeas ground VIII, Petitioner contends that the trial court violated his due process rights when instructing the jury on felony murder by removing the "essential element of malice from the jury's consideration." (ECF No. 1, PageID.18.) Specifically, Petitioner argues that the trial court erred by stating that "when they did the act that caused the death of Jason Cherry, the defendants were committing the crime of robbery." (ECF No. 1-1, PageID.147.) According to Petitioner, this instruction "did remove the jury's consideration of the element of malice" because the trial court "imputed the element of malice to the defendant's act." (*Id.*, PageID.148–49.)

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction so infected the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have so infused the trial with unfairness as to deny due process of law);

*Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders*, 221 F.3d at 860. If Petitioner

fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.

*Id.*

Aside from finding that this claim was waived because counsel "expressed satisfaction with

the jury instructions," the court of appeals noted "that the felony-murder instruction included all

the elements of felony murder." (ECF No. 23-18, PageID.784.) This Court agrees. As the Michigan

Supreme Court has noted:

> The elements of felony murder are: (1) the killing of a human being, (2) with the
> intent to kill, to do great bodily harm, or to create a very high risk of death or great
> bodily harm with knowledge that death or great bodily harm was the probable result
> [i.e., malice], (3) while committing, attempting to commit, or assisting in the
> commission of any of the felonies specifically enumerated in [Mich. Comp. Laws
> § 750.316(1)(b), including robbery].

*Carines*, 597 N.W.2d at 759. Malice may be inferred "from evidence that the defendant

intentionally set in motion a force likely to cause death or great bodily harm," as well as "from the

use of a deadly weapon." *Id.* The underlying felony is a factor the jury may use to find malice, but

malice cannot be inferred merely from the defendant's intent to commit the underlying felony. *See*

*id* at 136. Here, the trial court provided the following instructions with respect to felony murder:

(1) that Cherry died "by gunshot wounds inflicted by the defendants or others acting in concert

with them"; (2) that the defendants either "intended to kill or they intended to do great bodily harm

to Jason Cherry or they knowingly created a very high risk of death or great bodily harm knowing

that such—that death or such harm would be the likely result of their actions"; and (3) when they

"did the act that caused the death of Jason Cherry, the defendants were committing the crime of

robbery." (ECF No. 23-11, PageID.678.) The trial court then instructed the jury with respect to

robbery. (*Id.*)

43

Petitioner's argument regarding the jury instructions lacks merit. The trial court properly instructed the jury with respect to the elements of first-degree felony murder, particularly malice. Petitioner has not demonstrated that the court of appeals' determination was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to relief with respect to habeas ground VIII.

### F.    Double Jeopardy

As his final ground for relief, Petitioner contends that his double jeopardy rights were violated when he was convicted of both felony murder and the underlying felony. (ECF No. 1, PageID.20.)

The Double Jeopardy Clause guarantees that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This clause protects against multiple punishments for the same offense. *See United States v. Dixon*, 509 U.S. 688, 696 (1993); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Costo v. United States*, 904 F.2d 344 (6th Cir. 1990). The protection against multiple punishments for the same criminal act "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984). This guarantee serves principally as a restraint on courts and prosecutors, not on legislatures. *See Garrett v. United States*, 471 U.S. 773, 793 (1985) (no double-jeopardy violation when Congress intended to permit prosecution for continuing criminal enterprise after prior conviction for predicate offense); *Missouri v. Hunter*, 459 U.S. 359, 365–66 (1983). Therefore, when determining whether punishments are "multiple" under this aspect of the Double Jeopardy Clause, the Court is bound by the intent of the legislature. *Johnson*, 467 U.S. at 499; *Hunter*, 459 U.S. at 366–68.

In this context, the United States Supreme Court has traditionally applied the "same-elements" test first enunciated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *See*

44

*Rutledge v. United States*, 517 U.S. 292, 297 (1996). The same-elements test, also known as the "*Blockburger* test," inquires whether each offense contains an element not contained in the other. If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. If not, they are the "same offense" and double jeopardy bars additional punishment. *See Brown v. Ohio*, 432 U.S. 161, 168–69 (1977). If the *Blockburger* test is satisfied, however, it is presumed that the legislature intended to punish the defendant under both statutes and there is no double jeopardy bar to multiple punishments. *See Whalen v. United States*, 445 U.S. 684, 691–92 (1980).

In *Whalen*, the defendant had been convicted in the Superior Court for the District of Columbia of rape and of killing the same victim in perpetration of rape. *Id.* at 685. He was sentenced to "consecutive terms of 20 years to life for first-degree murder, and of 15 years to life for rape." *Id.* The Supreme Court granted certiorari to consider whether the imposition of cumulative punishments violated the defendant's double jeopardy rights. *Id.* at 686.

In concluding that Whalen's double jeopardy rights had been violated, the Court found that Congress had not authorized consecutive sentences "in the circumstances of [his] case." *Id.* at 690. After considering the legislative history of the provisions at issue, the Court noted that

> resort to the *Blockburger* rule leads to the conclusion that Congress did not authorize consecutive sentences for rape and for a killing committed in the course of the rape, since it is plainly not the case that "each provision requires proof of a fact which the other does not." A conviction for killing in the course of a rape cannot be had without proving all the elements of the offense of rape.

*Id.* at 693–94. The Court was "unpersuaded that [Whalen's] case should be treated differently for other cases in which one criminal offense requires proof of every element of another offense." *Id.* at 694.

As set forth above, the focus for determining whether a double jeopardy violation has occurred focuses on legislative intent. In 2008, the Michigan Supreme Court considered the issue of "whether convicting and sentencing a defendant for both first-degree felony murder and the predicate felony violates the 'multiple punishments' strand of the Double Jeopardy Clause of the United States and Michigan constitutions." *People v. Ream*, 750 N.W.2d 536, 537–38 (Mich. 2008). Ream had been "convicted and sentenced for first-degree felony murder and first-degree criminal sexual conduct, where the latter constituted the predicate felony for the former." *Id.* at 538.

Unlike in *Whalen*, however, the Michigan Supreme Court concluded that "convicting and sentencing a defendant for both felony murder and the predicate felony does not necessarily violate the 'multiple punishments' strand of the Double Jeopardy Clause." *Id.* at 538. The court noted that the "*Blockburger* test is a toll to be used to ascertain legislative intent. . . . Because the statutory elements, not the particular facts of the case, are indicative of legislative intent, the focus must be on these statutory elements." *Id.* at 545. Upon applying that test and analyzing the statutes in question, the Michigan Supreme Court noted:

> [f]irst-degree felony murder contains an element not included in first-degree criminal sexual conduct, namely, the killing of a human being. Similarly, first-degree criminal sexual conduct contains an element not necessarily included in first-degree felony murder, namely, a sexual penetration. First-degree felony murder does not necessarily require proof of a sexual penetration because first-degree felony murder can be committed without also committing first-degree criminal sexual conduct.

*Id.* at 546–47. Thus, the court concluded that the Michigan legislature, unlike Congress, intended for the possibility of multiple punishments when drafting its felony murder statute.

As noted *supra*, Petitioner contends that his convictions for felony murder and armed robbery (the underlying felony) violate his double jeopardy rights. The court of appeals rejected Petitioner's claim, stating:

46

> Finally, Slaughter-Butler argues that his convictions for felony murder and the underlying felony, armed robbery, violate his constitutional protection against double jeopardy. In *People v. Ream*, 481 Mich. 223, 240; 750 NW2d 536 (2008), our Supreme Court held that convicting and sentencing a defendant for felony murder and the underlying felony does not violate the prohibition against double jeopardy if each offense has an element that the other does not. Felony murder and armed robbery each contain an element that is not contained in the other crime. See *People v. Smith*, 478 Mich. 292, 319; 733 NW2d 351 (2007). Consequently, Slaughter-Butler's convictions of both felony murder and the predicate felony of armed robbery do not violate the protection against double jeopardy. *Id.*; *Ream*, 481 Mich at 240.

(ECF No. 23-18, PageID.784.) Although the court of appeals cited state court authority for the standard, the standard applied is identical to *Blockburger*. Moreover, as discussed *supra*, *Ream* itself cites the *Blockburger* test. *Ream*, 750 N.W.2d at 538–46. Thus, there is no question that the court of appeals applied the correct standard.

Moreover, Petitioner has failed to demonstrate that the court of appeals' determination regarding his double jeopardy claim is an unreasonable application of clearly established federal law. As noted above, the court of appeals cited to *Smith*, in which the Michigan Supreme Court stated:

> The elements of first-degree felony murder are "'(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of – death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b), here robbery].'" *People v. Carines*, 460 Mich 750, 758–759, 597 NW2d 130 (1999) (citation omitted). The elements of armed robbery are: (1) an assault and (2) a felonious taking of property from the victim's presence or person (3) while the defendant is armed with a weapon. *Id.* at 757, 597 NW2d 130. First-degree felony murder contains elements not included in armed robbery—namely a homicide and a *mens rea* of malice. Likewise, armed robbery contains elements not necessarily included in first-degree felony murder—namely that the defendant took property from a victim's presence or person while armed with a weapon.

*Smith*, 733 N.W.2d at 365.

"When assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes" and "by a state court's determination of the legislature's

47

intent." *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989) (citing *Hunter*, 459 U.S. at 368;

*O'Brien v. Skinner*, 414 U.S. 524, 531 (1974); *Ohio v. Johnson*, 467 U.S. 493 ,499 (1983)). "Thus,

for purposes of double jeopardy analysis, once a state court has determined that the state legislature

intended cumulative punishments, a federal habeas court must defer to that determination." *Volpe*

*v. Trim*, 708 F.3d 688, 697 (6th Cir. 2013) (quoting *Banner*, 886 F.2d at 777). Petitioner's claim

for relief is, therefore, squarely foreclosed by the Michigan Supreme Court's determinations that

the Michigan legislature intended for first-degree felony murder and underlying predicate felonies,

including the predicate felony of armed robbery, be subject to separate punishments. Petitioner has

failed to demonstrate that the court of appeals' determination regarding his double jeopardy claim

is contrary to, or an unreasonable application of, clearly established federal law. Petitioner's ninth

ground for relief will, therefore, be dismissed.[3]

## V.      Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of

appealability should be granted. A certificate should issue if Petitioner has demonstrated a

"substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a

certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).

Rather, the district court must "engage in a reasoned assessment of each claim" to determine

whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth

by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under

---

[3] In any event, Petitioner has not been subjected to additional punishment as set forth in *Brown*. As noted above, the trial court sentenced Petitioner to, *inter alia*, **concurrent** terms of life without the possibility of parole for murder and life for armed robbery. (J. of Sentence, ECF No. 1-1, PageID.27.)

48

*Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated:    July 6, 2022                              /s/ Janet T. Neff
                                                     Janet T. Neff
                                                     United States District Judge